IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| A.H.[1] | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| MARTIN O'MALLEY, | : | NO. 22-4942 |
| Commissioner of Social Security[2] | : | |

**MEMORANDUM AND ORDER**

ELIZABETH T. HEY, U.S.M.J.                              September 13, 2024

Plaintiff seeks review of the Commissioner's decision denying her application for disability insurance benefits ("DIB"). For the reasons that follow, I conclude that the decision of the Administrative Law Judge ("ALJ") is not supported by substantial evidence. Therefore, I remand the case for further proceedings pursuant to sentence four of 42 U.S.C. § 405(g).

## I.      **PROCEDURAL HISTORY**

Plaintiff protectively filed an application for DIB on October 13, 2020, alleging disability beginning on August 21, 2020, due to heart problems, an artificial heart mitral valve, rheumatoid arthritis ("RA"), difficulty walking, depression, sleep issues, residual

---

[1]Consistent with the practice of this court, to protect the privacy interests of plaintiffs in social security cases, I will refer to Plaintiff using her initials. See Standing Order – In re:  Party Identification in Social Security Cases (E.D. Pa. June 10, 2024).

[2]Martin O'Malley became the Commissioner of Social Security on December 20, 2023.  Pursuant to Rule 25(d) of the Federal Rules of Civil Procedure, Commissioner O'Malley should be substituted for Kilolo Kijakazi as the defendant in this action.  No further action need be taken to continue this suit by reason of the last sentence of section 205(g) of the Social Security Act, 42 U.S.C. § 405(g).

effects of the coronavirus ("COVID-19"), concentration and memory issues, and

shortness of breath.  Tr. at 55, 205-06, 227.[3]  Her application was denied initially and on

reconsideration.  Id. at 54-74, 76-96, 103-06, 113-15.  At her request, id. at 123-24, an

administrative hearing was held before an ALJ on September 8, 2021.  Id. at 31-53.  On

September 15, 2021, the ALJ issued an unfavorable decision, finding that Plaintiff was

not disabled.  Id. at 15-25.  The Appeals Council denied Plaintiff's request for review on

October 26, 2022, id. at 1-6, making the ALJ's September 15, 2021 decision the final

decision of the Commissioner.  20 C.F.R. § 404.981.

Plaintiff commenced this action in federal court on December 13, 2022.  Doc. 1.

The matter is now fully briefed and ripe for review.  Docs. 12-14.[4]

## II.   LEGAL STANDARD

The court's role on judicial review is to determine whether the Commissioner's

decision is supported by substantial evidence.  42 U.S.C. § 405(g); Schaudeck v. Comm'r

of Soc. Sec., 181 F.3d 429, 431 (3d Cir. 1999).  Therefore, the issue in this case is

whether there is substantial evidence to support the Commissioner's conclusions that

Plaintiff is not disabled.  Substantial evidence is "such relevant evidence as a reasonable

---

[3]To be entitled to DIB, Plaintiff must establish that she became disabled on or
before her date last insured ("DLI").  20 C.F.R. § 404.131(b).  The ALJ found and the
Certified Earnings Record confirms that Plaintiff is insured through June 30, 2025.  Tr. at
15, 214.

[4]Following the reassignment of this case from Judge Strawbridge, Doc. 15, the
parties consented to magistrate judge jurisdiction pursuant to 28 U.S.C. § 636(c).  See
Standing Order – In Re: Direct Assignment of Social Security Appeals to Magistrate
Judges – Extension of Pilot Program (E.D. Pa. Nov. 27, 2020); Doc. 17.

mind might accept as adequate to support a conclusion," and must be "more than a mere scintilla."  Zirnsak v. Colvin, 777 F.2d 607, 610 (3d Cir. 2014) (quoting Rutherford v. Barnhart, 399 F.3d 546, 552 (3d Cir. 2005)).  The court has plenary review of legal issues.  Schaudeck, 181 F.3d at 431.

To prove disability, a claimant must demonstrate an "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for . . . not less than twelve months."  42 U.S.C. § 423(d)(1).  The Commissioner employs a five-step process, evaluating:

> 1.  Whether the claimant is currently engaged in substantial gainful activity;
>
> 2.  If not, whether the claimant has a "severe impairment" that significantly limits her physical or mental ability to perform basic work activities;
>
> 3.  If so, whether based on the medical evidence, the impairment meets or equals the criteria of an impairment listed in the listing of impairments ("Listings"), 20 C.F.R. pt. 404, subpt. P, app. 1, which results in a presumption of disability;
>
> 4.  If the impairment does not meet or equal the criteria for a listed impairment, whether, despite the severe impairment, the claimant has the residual functional capacity ("RFC") to perform her past work; and
>
> 5.  If the claimant cannot perform her past work, then the final step is to determine whether there is other work in the national economy that the claimant can perform.

See Zirnsak v. Colvin, 777 F.3d 607, 610 (3d Cir. 2014); see also 20 C.F.R. § 404.1520(a)(4).  Plaintiff bears the burden of proof at steps one through four, while the

burden shifts to the Commissioner at the fifth step to establish that the claimant is capable of performing other jobs in the local and national economies, in light of her age, education, work experience, and RFC.  See Poulos v. Comm'r of Soc. Sec., 474 F.3d 88, 92 (3d Cir. 2007); see also Biestek v. Berryhill, 587 U.S. 97, 102 (2019) (substantial evidence "means only – 'such relevant evidence as a reasonable mind might accept as adequate to support a conclusion'") (quoting Consol. Edison Co. v. NLRB, 305 U.S. 197, 229 (1938)).  The court has plenary review of legal issues.  Schaudeck, 181 F.3d at 431.

## III.   DISCUSSION

### A.   ALJ's Findings and Plaintiff's Claims

In the September 15, 2021 decision under review, the ALJ found at step one that Plaintiff has not engaged in substantial gainful activity since August 21, 2020, the alleged onset date.  Tr. at 17.  At step two, the ALJ found that Plaintiff suffers from the severe impairments of obesity and RA, id., and the non-severe impairments of mitral valve replacement, COVID-19, and depression.  Id. at 17-20.  Further, the ALJ found that Plaintiff has mild limitations in the functional areas of concentrating, persisting, and maintaining pace and in adapting or managing oneself, and no limitation in the areas of understanding, remembering, or applying information and in interacting with others.  Id. at 19-20.  At step three, the ALJ found that Plaintiff does not have an impairment or combination of impairments that meets or medically equals the severity of one of the Listings.  Id. at 20.

The ALJ determined that Plaintiff retains the RFC to perform light work except she can never climb ladders, ropes, or scaffolds, crawl, or kneel; occasionally perform

other postural movements; frequently handle, finger, push, and pull bilaterally; and cannot work in extreme temperatures or humidity, or around concentrated pulmonary irritants or fumes.  Tr. at 21.  Based on the testimony of a vocational expert ("VE"), the ALJ found at step four that Plaintiff can perform her past relevant work as a medical assistant.  Id. at 24.[5]

Plaintiff argues that the ALJ erred by (1) finding residuals from Plaintiff's COVID-19 infection to be a non-severe impairment, and (2) improperly assessing her credibility as to the limiting effects of the COVID-19 residuals and by failing to consider her lengthy work history.  Doc. 12 at 2; Doc. 14 at 1-4.  Defendant responds that the ALJ's decision is supported by substantial evidence.  Doc. 13 at 10-26.

**B.      Plaintiff's Claimed Limitations and Testimony at the Hearing**

Plaintiff was born on December 13, 1958, and thus was 61 years of age at the time of her alleged disability onset date (August 21, 2020), and 62 at the time of the ALJ's decision (September 15, 2021).  Tr. at 224.  She is about five feet, three inches tall and weighs approximately 197 pounds.  Id. at 227.  Plaintiff completed high school and has past relevant work as a medical assistant, which she performed for approximately thirty years.  Id. at 40, 229.  Plaintiff lives with her son in a home that has two stories and a basement.  Id. at 37-38.

At the September 8, 2021 administrative hearing, Plaintiff testified that she stopped working as a medical assistant in August 2020 because the doctor she worked for

---

[5]The ALJ did not make an alternative step-five determination.

died and she was laid off.  Tr. at 39.  Plaintiff further explained that at the time she had

just returned to work after being hospitalized with COVID-19 and that she was unable to

perform her duties, as evidenced by memory issues such as trouble remembering

passwords.  Id. at 39-40.  She also explained that returning to her work setting was

traumatic in light of her own COVID-19 infection, which she believes she contracted at

work.  Id. at 40.  Her job required her to stand and walk all day, id. at 41, but she

experienced increasing pain and foot swelling due to RA and shortness of breath with

walking or using stairs.  Id. at 41-42.  When asked why she could not perform a job that

did not require standing all day, Plaintiff replied that "when I'm walking I have to sit

down because I get short of breath.  I'm very winded even talking right now."  Id. at 44.

Plaintiff testified that she takes several medications, including aspirin, warfarin, an

albuterol inhaler, sertraline and Xanax – the latter two medications to treat anxiety and

panic attacks which began after her COVID-19 hospitalization.  Id. at 42-43.[6]

Plaintiff testified that she has limitations regarding household chores.  Tr. at 46.

She explained that she can do light dusting but is unable to clean, vacuum, or mop, that

her son does most of the cleaning, and that her niece comes over to help with cleaning

---

[6]Warfarin (marketed as Coumadin) is a blood thinner used to treat or prevent blood clots.  See https://www.drugs.com/warfarin (last visited Aug. 26, 2024).  Albuterol is a bronchodilator that relaxes muscles in the airways and increases air flow to the lungs.  See https://www.drugs.com/albuterol (last visited Aug. 26, 2024).  Sertraline (marketed as Zoloft) is a medication used for, among other things, depression, panic disorders, and post-traumatic stress disorder.  See https://www.drugs.com/sertraline (last visited Aug. 26, 2024).  Xanax (generic alprazolam) is used to treat anxiety and panic disorders.   See https://www.drugs.com/xanax (last visited Aug. 26, 2024).

such things as the bathroom.  Id.  Plaintiff uses a shower chair and wears slip-on shoes because she cannot bend to tie her shoes.  Id. at 46-47.

At the hearing, a VE classified Plaintiff's job as a medical assistant as skilled and light exertional work.  Tr. at 48.  Based on the hypothetical posed by the ALJ with the limitations included in the ALJ's RFC assessment, see supra at 4-5, the VE testified that such an individual could perform Plaintiff's past relevant work.  Tr. at 24.  The VE further testified that if the individual required a sit-stand option where they would need to alternate between sitting and standing approximately every hour during the workday, such an individual would not be able to perform Plaintiff's past relevant work.  Id. at 49.

### B.    Medical Evidence Summary[7]

Plaintiff has a long history of arthritis, beginning in May 2007 when rheumatologist Stanley Z. Nosheny, M.D., agreed with Plaintiff's primary physician that Plaintiff's persistent complaints of various musculoskeletal aches and pains "is probably early [RA]," for which Dr. Nosheny prescribed Methotrexate and lowered Plaintiff's dose of prednisone.  Tr. at 322.[8]

---

[7]Because Plaintiff's claims relate to the alleged physical and mental residuals of COVID-19, the medical evidence summary will focus primarily on those conditions.

[8]Methotrexate is used to treat RA, among other conditions.  See https://www.drugs.com/methotrexate (last visited Aug. 26, 2024).  Prednisone (marketed as Deltasone) is a corticosteroid used to decrease inflammation and control overactive immune systems in the treatment of, among other things, arthritis and breathing disorders.  See https://www.drugs.com/prednisone (last visited Aug. 26, 2024).

On March 31, 2020, Plaintiff tested positive for COVID-19, with associated symptoms of fever, chills, fatigue, myalgias, headache, cough, decreased appetite, and anosmia.  <u>Tr.</u> at 358.[9]  On April 3, 2020, she presented to the emergency room ("ER") with fever and dyspnea.  <u>Id.</u> at 357-58.[10]  The attending physician noted Plaintiff's history of mitral valve replacement (in 2001) and RA.  <u>Id.</u> at 358.  ER personnel diagnosed Plaintiff with acute hypoxic respiratory failure related to COVID-19 and admitted her to the pulmonary floor with ventilator support.  <u>Id.</u> at 358, 413, 439.  Treatment in the hospital also included high dose steroids, hydroxychloroquin ("HCQ"), and an experimental protocol involving IL- monoclonal antibodies.  <u>Id.</u> at 439.[11]  On April 21, 2020, Plaintiff was discharged from the hospital with oxygen to be used around the clock.  <u>Id.</u>  Two days later, in a telemedicine follow-up with John P. Woodward, M.D., the

---

[9]Myalgia refers to muscle pain.  <u>Dorland's Illustrated Medical Dictionary</u>, 32nd ed. (2012) ("<u>DIMD</u>"), at 1214.  Anosmia is the absence of the sense of smell.  <u>Id.</u> at 42.

[10]Dyspnea refers to shortness of breath.  <u>DIMD</u> at 582.

[11]HCQ (marketed as Plaquenil) is used to prevent malaria and to treat symptoms of RA.  <u>See</u> https://www.drugs.com/hydroxychloroquine (last visited Aug. 26, 2024).  HCQ was also used to treat COVID-19 during the early period of the pandemic, until in June 2020 the Food and Drug Administration (FDA) revoked the emergency use authorization of HCQ for treatment of the virus.  <u>See</u> https://www.drugs.com/medical-answers/hydroxychloroquine-effective-covid-19-3536024/ (last visited Aug. 26, 2024).  Monoclonal antibodies are man-made proteins that mimic natural antibodies produced by the immune system, and are used to treat various types of illnesses.  <u>See</u> https://www.drugs.com/medical-answers/what-monoclonal-antibodies-3574204/ (last visited Aug. 26, 2024).
While hospitalized, Plaintiff also received sarilumab, <u>tr.</u> at 358, 413, which is used to treat moderate to severe RA.  <u>See</u> https://www.drugs.com/sarilumab (last visited Aug. 26, 2024).

doctor noted that Plaintiff continued to experience dyspnea on exertion, even with the oxygen.  Id. at 439.

On May 3, 2020, Plaintiff returned to the ER and was hospitalized a second time due to bilateral foot numbness and right foot discoloration, with reports of dyspnea on exertion and throbbing headaches involving her entire head.  Tr. at 413.  Physicians initially suspected a COVID-19 complication, but hematology determined that it was related to a clotting factor.  Id.  at 413, 422.  In a discharge summary completed on May 6, 2020, James Ruggero, M.D., listed Plaintiff's discharge diagnoses as rheumatic heart disease with mitral valve replacement requiring chronic anticoagulation (warfarin), RA, and acute hypoxic respiratory failure secondary to COVID-19, and noted that Plaintiff continued to have dyspnea on exertion.  Id. at 413.

On May 14, 2020, in a telemedicine visit with Dr. Woodward, Plaintiff reported "feeling a lot better" and having "a little" dypsnea on exertion, with an oxygen saturation level of 96%, and the doctor discontinued the order for oxygen.  Tr. at 448.  On May 21, 2020, Plaintiff told Dr. Woodward that her shortness of breath had improved, but that she had experienced a panic attack when she went to the grocery store for the first time since her COVID-19 hospitalization.  Id. at 453.  On May 28, 2020, Plaintiff informed Dr. Woodward that she "[g]ets tired with any significant exertion." Id. at 455.  In early June, Plaintiff still reported doing well but that she experienced fatigue and dyspnea with exertion, and was on track to return to work on June 15.  Id. at 458, 470.

On July 28, 2020, Plaintiff treated with cardiologist George Yesenosky, M.D., for follow-up evaluation of her cardiac disease and mitral valve replacement.  Tr. at 748.

Plaintiff reported that she had not fully recovered from COVID-19 and that she continued to use oxygen at home and to experience dyspnea on exertion.  Id. at 749.[12]  Upon examination, Plaintiff exhibited dyspnea on exertion and shortness of breath.  Id. at 751. Dr. Yesenosky adjusted Plaintiff's warfarin to reduce her risk for a cardioembolic event. Id. at 752.  Plaintiff reported that she would be returning to work.  Id.

On September 1, 2020, Plaintiff presented to her primary care physician with chief complaints of anxiety and shortness of breath.  Tr. at 657.  Plaintiff reported that she thought she had residual effects from COVID-19 and wondered if anxiety made her breathing more difficult.  Id.  She had oxygen at home to use as needed, and experienced relief after 15 -to- 20 minutes' use.  Id.  She reported decreased concentration, dysphoric mood, and sleep disturbance.  Id. at 658, 661.  Upon examination, Plaintiff exhibited anxious and depressed mood and was tearful.  Id. at 659.  Her primary care provider prescribed Zoloft and alprazolam for her mental health complaints.  Id.  During a follow-up on September 15, 2020, Paul S. Karlin, D.O., noted that Plaintiff continues to experience shortness of breath since her COVID-19 hospitalization, has difficulty climbing stairs, and continues to use oxygen at home "on bad days."  Id. at 1015-16.

On September 21, 2020, a CT of Plaintiff's chest showed marked improvement in the appearance of her lungs compared to a prior study, with some mild residual interstitial prominence in the mid and upper zones and some mild scarring.  Tr. at 1018, 1057. Pulmonary function testing performed four days later found no evidence of obstructive or

---

[12]It is not clear at what time Plaintiff's doctors renewed the prescription for home oxygen.

restrictive ventilatory defects and suggested the presence of a diffusion impairment which corrects based on alveolar volume.  Id. at 640.  A six-minute walking test showed no desaturation, but Plaintiff reported severe dyspnea at the end of the test -- a report which the doctor included in his impression of Plaintiff.  Id. at 646.

On December 1, 2020, state agency psychologist Richard Williams, Ph.D., performed a review of Plaintiff's mental health records as part of the initial disability determination.  Tr. at 63-64.  Dr. Williams opined that Plaintiff "has multiple and various medical issues and some secondary symptoms of depression and anxiety," with stress concerning the loss of her long-term job and "some issues with concentration and sleep disturbance," but that "the medical data on file does not establish a severity level of mental impairment that would prohibit completion of tasks."  Id. at 64.  Dr. Williams further opined that Plaintiff's allegations were "partially consistent."  Id.

On January 19, 2021, Anne Vigderman, M.D., performed an internal medicine examination ("IME") of Plaintiff.  Tr. at 772-76.  Dr. Vigderman summarized Plaintiff's medical history, including her mitral valve replacement and weekly transient chest pain; pain in her hands, knees and back, and difficulty walking and climbing stairs due to RA; and her COVID-19 hospitalization and subsequent use of at-home oxygen, which Plaintiff discontinued one week prior to the IME.  Id. at 772.  Plaintiff reported that she gets shortness of breath easily with minimal exertion and needs help at home.  Id. at 772, 773.  Upon examination, Dr. Vigderman noted that Plaintiff "is visibly dyspneic with routine conversation."  Id. at 774.  The doctor diagnosed Plaintiff with history of mitral valve replacement on chronic anticoagulation, RA, history of spontaneous

11

pneumothorax,[13] recent COVID-19 infection with ongoing shortness of breath, and borderline diabetes, and opined that her prognosis was guarded.  Id. at 776.

On January 22, 2021, state agency physician Ethel Hooper, M.D., performed a record review and RFC assessment of Plaintiff's physical impairments as part of the initial disability determination.  Tr. at 60-62, 66-71.  Dr. Hooper opined that Plaintiff could lift/carry 20 pounds occasionally and 10 pounds frequently, stand/walk and sit for 6 hours each in an 8-hour workday, and was unlimited in the ability to push/pull except for the limitations as to lift/carry.  Id. at 66-67.  As to postural limitations, Dr. Hooper opined that Plaintiff could never climb ladders, ropes, or scaffolds, and occasionally climb ramps/stairs, balance, stoop, kneel, crouch, and crawl.  Id. at 67.  The doctor further opined that Plaintiff should avoid concentrated exposure to fumes, odors, dusts, gases, and poor ventilation, and hazards.  Id. at 69.

On February 17, 2021, Plaintiff complained to her primary care provider of ongoing shortness of breath on exertion, depression, decreased concentration and mood swings, chronic pain in her bilateral knees and upper back, and feeling anxious, nervous, and a sense of isolation.  Tr. at 795-96.  She reported some improvement with sertraline (Zoloft), but she took the medication for only two months, and complained of weight gain.  Tr. at 796.  Plaintiff exhibited a sad mood and a blunted affect, and her physical examination yielded normal results.  Id. at 796-97.  The relevant encounter diagnoses

---

[13]Pneumothorax refers to the presence of air in the space between the lungs and chest wall.  DIMD at 1476.

included RA, anxiety and depression, and fatigue, unspecified type.  Id. at 797-98.  The provider reordered Zoloft for treatment of Plaintiff's mental complaints.  Id. at 799.

On May 12, 2021, Plaintiff returned to Dr. Karlin for a pulmonary follow-up.  Tr. at 937-41.  Plaintiff reported improvement in both her shortness of breath and mood, id. at 937, 939, and that she was "just getting back on her feet."  Id. at 937.  Dr. Karlin performed pulmonary testing and stated that "[s]pirometry is improved from [Plaintiff's] last visit but continues to show mild to moderate restrictive pattern, likely due to her weight."  Id. at 940.  The doctor noted that "I suspect some of her restriction was due to weight gain, however some post-inflammatory pulmonary fibrosis was likely with some residual linear scarring seen on chest x-ray, but most of the substantial lung infiltrates had cleared."  Id. at 937.  Dr. Karlin similarly opined that he suspected "a significant portion of her lung restriction is due to her weight and will be improvable, all proportion is related to post COVID residual scarring."  Id. at 940-41.

On August 3, 2021, physical therapist ("PT") Trinh Nguyen completed a medical source statement of ability to work-related activities.  Tr. at 1162-63.  Based on a one-time session, the PT diagnosed "ankylosing spondylitis of unspecified spine,"[14] RA, and "stiffness of unspecified knee."  Id. at 1162.  The PT opined that Plaintiff could sit for up to 2 hours and stand/walk less than 1 hour in an 8-hour workday, should never lift/carry or push/pull any weight, rarely reach, handle, finger and feel, and that pain or other

---

[14]Ankylosing spondylitis is a type of arthritis that causes inflammation in the joints and ligaments of the spine.  See https://www.niams.nih.gov/ankylosingspondylitis (last visited Aug. 27, 2024).  The ankylosing spondylitis diagnosis does not appear elsewhere in the medical record.

symptoms would constantly interfere with Plaintiff's ability to focus and concentrate during the workday.  Id. at 1162-63.  The PT further opined that Plaintiff should avoid temperature extremes, hazards, and fumes, odors, chemicals, and gasses.  Id. at 1163.  Lastly, the PT indicated that Plaintiff would need unscheduled breaks every 15 minutes, lasting 30 minutes -to- 1 hour each, and that she would be absent from work more than 4 times or more per month.  Id.

### C.    Plaintiff's Claims

As previously noted, the ALJ found that Plaintiff could perform a range of light work and could return to her prior work as a medical assistant. Tr. at 21, 24.[15]  Plaintiff presents two primary claims challenging the ALJ's consideration of (1) residuals from Plaintiff's COVID-19 hospitalization and (2) Plaintiff's subjective complaints regarding these residuals, particularly in light of her lengthy work history.  Doc. 12 at 2; Doc. 14 at 1-4.  Because I find that the ALJ erred in considering the evidence related to the residual impact of her COVID-19, and because that error was not harmless, I will remand the case for further consideration.

---

[15] Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to ten 10 pounds.  20 C.F.R. § 404.1567(b).  Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.  Id.  To be considered capable of performing a full or wide range of light work, a claimant must have the ability to do substantially all of these activities.  Id.

Plaintiff first alleges that the ALJ mischaracterized the treatment notes following

Plaintiff's COVID-19 hospitalization.  Doc. 12 at 6-16; Doc. 14 at 1-4.  In addressing this

impairment, the ALJ stated:

> Shortness of breath and residual effects of COVID-19 were
> alleged by [Plaintiff] to limit her ability work.  Hearing
> testimony indicated she continues to experience shortness of
> breath.  She was on supplemental oxygen for a couple of
> months after being hospitalized.  Medical records document
> [Plaintiff] was hospitalized for over two weeks in April 2020
> due to COVID-19 pneumonia and acute respiratory failure
> with hypoxia.  Worsening dyspnea was occurring.  Even after
> being discharged on supplemental oxygen around the clock,
> she continued to experience shortness of breath and
> palpitations with exertion.  [Plaintiff was] doing well in early
> June 2020 despite some dyspnea of exertion and fatigue with
> exertion.  Pulmonary function testing completed three months
> later found her [forced expiratory volume] value to be slightly
> reduced but other findings were normal with no airflow
> obstruction present.  Shortness of breath was still an issue for
> her in February 2021.  However, on physical examination, her
> pulmonary effort and breath sounds were normal.  Her
> supplemental oxygen had recently been discontinued.  Three
> months later, her spirometry was improved but she continued
> to show mild to moderate restrictive pattern, likely due to her
> weight.  Despite some ongoing respiratory issues, the
> evidence of record fails to establish [Plaintiff's] COVID-19
> significantly limited her ability to perform basic work
> activities for twelve consecutive months.  Her respiratory
> issues have been mild in 2021 and suspected to be due to her
> weight gain and some overall deconditioning.  Furthermore,
> no airflow obstruction has been found on recent testing.
> Therefore, COVID-19 is not a severe impairment for
> [Plaintiff].

Tr. at 18 (exhibit citations omitted).

There are several problems with the ALJ's discussion of Plaintiff's COVID-19

treatment and aftermath.  Most significantly, although the ALJ acknowledged that

Plaintiff was hospitalized and placed on a ventilator due to COVID-19 and that she continued to experience dyspnea on exertion and shortness of breath following her discharge and while at home with oxygen, the ALJ failed to acknowledge that shortness of breath on exertion remained a persistent and limiting problem throughout the medical record, extending beyond the twelve-month durational requirement.  As the medical summary following her hospitalization demonstrates, the record is replete with references to Plaintiff's shortness of breath and/or fatigue with exertion, including when walking or climbing stairs.  See, e.g., tr. at 413 (5/3/20), 448 (5/14/20), 455 (5/28/20), 749 & 751 (7/28/20), 657 (9/1/20), 1015-16 (9/15/20), 646 (9/25/20), 772-73 (1/19/21), 795-96 (2/17/21).  On January 19, 2021 -- approximately 9 months after Plaintiff's COVID-19 hospitalization -- Dr. Vigderman observed that "[Plaintiff] is visibly dyspneic with routine conversation."  Id. at 774.  By May 2021, Plaintiff reported that her shortness of breath had improved but spirometry testing "continues to show mild to moderate restrictive pattern."  Id. at 940.  Additionally, at the September 8, 2021 administrative hearing, Plaintiff explained that she cannot work or perform most household chores in part because she gets winded and must sit down.  Id. at 44.  In sum, the persistence of Plaintiff's post-COVID dyspnea on exertion over the course of more than a year undermines the ALJ's conclusion that Plaintiff retained the RFC to perform her prior work, particularly in light of the fact that her prior work as a medical assistant required her to be on her feet all day.  Id. at 41.

The ALJ also mischaracterized Plaintiff's respiratory residuals attributable to COVID-19.  For example, in the discussion quoted above the ALJ stated that Plaintiff's

respiratory issues in 2021 were "mild," despite acknowledging Dr. Karlin's May 2021 pulmonary test findings of "mild to moderate restrictive pattern." Id. at 18, 940. Also, although the ALJ was correct that Dr. Karlin suspected Plaintiff's weight was a cause of her respiratory issues, id. at 940, the ALJ omitted the doctor's contemporaneous observation that "postinflammatory pulmonary fibrosis was likely with some residual linear scarring seen on chest x-ray." Id. at 937. Importantly, as noted in the medical summary, Dr. Karlin concluded that although "a significant portion of [Plaintiff's] lung restriction is due to her weight and will be improvable, all proportion is related to post COVID residual scarring." Id. at 941. The ALJ omitted this analysis, thus confirming that the ALJ failed to acknowledge the impact of the scarring on Plaintiff's lungs.[16] This error requires remand. See Rutherford, 399 F.3d at 554 (quoting Mason v. Shalala, 994 F.2d 1058, 1066 (3d Cir. 1993)); see also Plummer, 186 F.3d at 429 (same) (ALJ may choose which evidence to credit and which evidence not to credit, so long as she does not "reject evidence for no reason or for the wrong reason.").

---

[16] To be fair, the ALJ's failure in this regard cannot be placed entirely on her shoulders. Plaintiff tested positive for COVID-19 on March 31, 2020, very early in the pandemic, and the ALJ issued her decision on September 15, 2021. I take judicial notice of the fact that medical science has made significant progress in understanding COVID-19 in the three years since the ALJ's decision, including greater understanding of the range and duration of certain residuals in certain individuals. Moreover, the ALJ's opinion predates the Social Security Administration's emergency message ("EM") regarding evaluation of COVID-19 cases. See EM-21032, Evaluating Cases with Coronavirus Disease 2019 (Covid 19), initially issued on August 9, 2022, and revised effective March 28, 2024, available at https://secure.ssa.gov/apps10/reference.nsf/links/03282024111904AM (last visited Aug. 27, 2024). Upon remand, the ALJ shall follow any applicable Social Security directives in evaluating the residuals from Plaintiff's COVID-19 infection, if deemed necessary.

Defendant argues that Plaintiff essentially asks the court to re-weigh the medical evidence of record, and he suggests that any errors on the part of the ALJ are harmless because the RFC assessment accounts for any limitations supported by the record.  Doc. 13 at 15-23.  I disagree.  As discussed above, remand is required because the ALJ erred in evaluating evidence of Plaintiff's COVID-19 residuals, particularly as to persistent dyspnea on exertion.  As noted, this is particularly problematic because the ALJ found that Plaintiff could perform light work, which requires a "good deal" of standing/walking, see 20 C.F.R. § 404.1567(b), and because the ALJ found that Plaintiff could perform her decades-long work as a medical assistant even though the job requires Plaintiff to be on her feet the "entire day."  Tr. at 41.  Moreover, if it were found on remand that Plaintiff can perform less than light exertional work, it is unclear what work she could perform given her limitations and the fact that she is a person of advanced age for purposes of the Social Security regulations.  See 20 C.F.R. § 404.1563(e) (defining advanced age as 55 years of age and older).

Similarly, the ALJ found Plaintiff's depression to be non-severe, tr. at 18-19, but did not consider whether and to what extent depression or any of her other mental health problems were attributable to COVID-19.  For example, Plaintiff was prescribed Zoloft for anxiety after her COVID-19 hospitalization because she experienced panic attacks, id. at 42-43, and the same medication was ordered again, by a different physician, ten months later in February 2021.  Id. at 799.  Plaintiff testified that when she returned to her medical assistant job after being hospitalized, she experienced memory problems and mental trauma because she believed that she contracted COVID-19 at work.  Id. at 39-40.

18

In her decision denying benefits, the ALJ acknowledged Plaintiff's reports of decreased concentration and mental status reports evidencing sad mood, blunt affect, and tearfulness, tr. at 19-20, but she did not address whether Plaintiff's mental health issues could be attributable to COVID-19 residuals, nor did she include any mental health limitations in her RFC assessment.  Because I have already determined that the matter should be remanded, I need not determine whether the ALJ committed independent error regarding Plaintiff's mental health impairments.  On remand, the ALJ will reconsider all the evidence in light of Social Security guidance regarding the impact of COVID-19, and obtain an updated expert medical opinion, if deemed necessary.

Plaintiff also contends that the ALJ failed to properly consider her subjective complaints, including failing to take into account her demonstrated work history.  Doc. 12 at 16-17.  Because I have already determined that the case must be remanded, I discuss this claim only briefly.

If Plaintiff's challenge were limited to the ALJ's failure to consider her work history in assessing her subjective complaints, I would be inclined to reject the argument. "Work history 'is only one of many factors an ALJ may consider in assessing a claimant's subjective complaints.'"  Sanborn v. Colvin, Civ. Action No. 13-224, 2014 WL 3900878, at *16 (E.D. Pa. Aug. 11, 2014) (quoting Thompson v. Astrue, Civ. Action No. 09-519, 2010 WL 3661530, at *4 (W.D. Pa. Sept. 20, 2010) (citing 20 C.F.R. § 404.1529(c)(3))), aff'd, 613 F. App'x 171 (3d Cir. 2015)  "Indeed, a claimant's work history alone is not dispositive of the question of . . . credibility, and an ALJ is not required to equate a long work history with enhanced credibility."  Id. (quoting

19

Thompson, 2010 WL 3661530, at *4).  In affirming the district court in Sanborn, the

Third Circuit concluded that the ALJ's failure to consider the claimant's substantial work

history did not require remand because the ALJ explained her reasoning and Plaintiff's

testimony of more restrictive abilities was belied by the medical evidence and evidence

of a more active lifestyle.  613 F. App'x at 177.

Here, in addition to ignoring Plaintiff's impressive work history, Plaintiff contends

that the ALJ's erroneous evaluation of COVID-19 physical and mental residuals, as

previously discussed, tainted her consideration of Plaintiff's subjective complaints.  The

ALJ stated:

> I find that [Plaintiff's] medically determinable impairments
> could reasonably be expected to cause the alleged symptoms;
> however, [Plaintiff's] statements concerning the intensity,
> persistence and limiting effects of these symptoms are not
> entirely consistent with the medical evidence and other
> evidence in the record. . . .  Her medical treatment has been
> conservative since the alleged onset date, consisting primarily
> of medi[c]ation management.  Additionally, [Plaintiff]
> stopped working around the alleged onset date when she lost
> her job and not primarily because of her medical
> impairments.

Tr. at 22.

The ALJ's statement that Plaintiff's medical treatment has been conservative and

consists mostly of medication management is misleading in light of the nature of

Plaintiff's COVID-19 residuals, as previously discussed, indicating that the ALJ's flawed

consideration of the residuals impacted her credibility determination.  Moreover, while it

is true that Plaintiff testified that she stopped working because she was laid off upon the

death of the doctor for whom she worked, tr. at 39, the ALJ's reliance on that statement

essentially punishes Plaintiff for bad timing.  That is, at the time Plaintiff was laid off,

she had just returned to working as a medical assistant in the aftermath of her COVID-19

hospitalization, which included several days of intensive care treatment on a ventilator.

She returned to her job while continuing on oxygen support at home as needed and while

experiencing dyspnea on exertion, difficulty standing, walking and climbing stairs as

necessary to perform her work, anxiety related to being in the workplace where she

believed she contracted COVID-19, and clouded thinking, such as difficulty

remembering passwords at work.  In other words, it is not at all clear that Plaintiff could

have continued to perform her job had it remained open.

On remand, Defendant shall reconsider Plaintiff's subjective complaints regarding

COVID-19 residuals and her pulmonary impairment and, if determined to be relevant,

should consider Plaintiff's work history in considering Plaintiff's subjective complaints.

## IV.   <u>CONCLUSION</u>

The ALJ's decision is not supported by substantial evidence.  The ALJ failed to

properly consider the medical record regarding the physical and mental residuals of

Plaintiff's COVID-19 hospitalization, which also impacted her assessment of Plaintiff's

subjective complaints.  Upon remand, the ALJ shall reconsider all the evidence in light of

Social Security guidance regarding the impact of COVID-19, and obtain an updated

expert medical opinion, if deemed necessary.

An appropriate Order follows.